******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# 914 NORTH COLONY, LLC *v.* 99 WEST, LLC
## (AC 46943)

Bright, C. J., and Cradle and Seeley, Js.

*Syllabus*

The plaintiff landlord and the defendant tenant entered into a lease agreement that required the defendant to pay base rent on a monthly basis, as well as charges for real estate taxes and water and sewer assessments. After the defendant failed to make its rent payment in April, 2020, the plaintiff served the defendant with a notice to quit for nonpayment of rent, which included a disclaimer stating that any payments tendered after the service of the notice to quit would be accepted as use and occupancy only. One day before the quit date on the notice, the defendant tendered payment for the April and May, 2020, base rent. Shortly thereafter and for the next few months, the parties' representatives had discussions regarding the defendant's tenancy at the premises. The plaintiff commenced the present action seeking to recover possession of the premises in October, 2020, when it became apparent that the defendant would not agree to a new lease. During the months when discussions were taking place between the parties' representatives, as well as after the underlying action was commenced, the plaintiff continued to send invoices to the defendant itemizing charges accruing under the lease, including rent, attorney's fees, real estate taxes, and late fees, while at times also requesting use and occupancy payments. The defendant made payments in response to each invoice. Following the plaintiff's case-in-chief at trial, the defendant's counsel made an oral motion to dismiss on the basis that the court lacked subject matter jurisdiction. The court granted the motion to dismiss, finding that the plaintiff's conduct after service of the notice to quit had rendered the notice to quit equivocal. On the plaintiff's appeal to this court, *held* that the trial court properly found that it lacked subject matter jurisdiction over the summary process action: the plaintiff's inconsistent characterization of what the lease referred to as base rent, its requests for payment including additional charges that were purportedly due under the terms of the lease, and the delay in initiating the summary process action undermined the effectiveness of the use and occupancy disclaimer; moreover, the plaintiff's actions created reasonable doubt in the mind of a reasonable tenant as to whether the lease, in fact, remained terminated, and the trial court therefore properly concluded that the notice to quit was rendered equivocal by the plaintiff's conduct.

Argued May 16—officially released July 16, 2024

*Procedural History*

Summary process action, brought to the Superior Court in the judicial district of New Haven, Housing Session, and tried to the court, *Spader, J.*; thereafter, the court, *Spader, J.*, granted the defendant's motion to dismiss and rendered judgment thereon, from which the plaintiff appealed to this court. *Affirmed.*

*John A. Farnsworth*, with whom, on the brief, was *Robert L. Rispoli*, for the appellant (plaintiff).

*Jonathan A. Kaplan*, with whom was *Sean M. McAuliffe*, for the appellee (defendant).

*Opinion*

BRIGHT, C. J. The plaintiff, 914 North Colony, LLC, appeals from the judgment of the trial court dismissing its summary process action against the defendant, 99 West, LLC. On appeal, the plaintiff claims that the court improperly concluded that the plaintiff had reinstated the tenancy by accepting the defendant's tendered payments after service of the notice to quit, despite the fact that the notice to quit included a use and occupancy disclaimer. We disagree with the plaintiff's characterization of the court's judgment and conclude that the court properly found that the plaintiff's actions rendered the notice to quit equivocal, thereby depriving the court of subject matter jurisdiction over the summary process action. Accordingly, we affirm the judgment of the trial court.

The following undisputed facts are relevant to our analysis.[1] On December 1, 2017, the plaintiff purchased a parcel of land located at 914 North Colony Road in Wallingford and consented to the assignment and assumption of a preexisting lease agreement (lease)

---

[1] Prior to trial, the parties submitted a "joint statement of undisputed material facts" for the court's consideration.

with the defendant, which operates a restaurant on the premises.[2] The initial term of the lease began on April 19, 1999, and expired on April 18, 2019, but the lease allowed the defendant to exercise a series of four options to extend the lease for additional five year terms, and the defendant had exercised the first of these four options to extend the lease until 2024. Under the lease, the defendant is responsible for payment of the base rent on the nineteenth day of each month and a 5 percent late fee for any late payments. The base rent amount is subject to an increase at the start of each five year term extension of the lease; throughout the events at issue in this appeal, the monthly base rent was $8078.34. The lease also requires the defendant to pay charges for real estate taxes as "additional rent" and water and sewer assessments. Customarily, the defendant pays the base rent on the first of each month and pays the other charges when billed by the plaintiff.

On March 10, 2020, Governor Ned Lamont declared a state of emergency because of the COVID-19 pandemic. Following this declaration, Governor Lamont issued Executive Order No. 7D, which prohibited restaurants from serving food or drink for on premises consumption. Following this restriction, the defendant started to offer takeout food but still suffered financially. On March 27, 2020, the defendant's corporate affiliate, 99 Restaurants, LLC, sent a letter to the plaintiff stating that, due to the financial impact of the pandemic and related restrictions, the defendant was excused from performance under the lease and would "not be paying the rent and other amounts due under the lease for the month of April, 2020." The plaintiff did not reply to this

---

[2] The plaintiff and the defendant are successors in interest to the original parties to the lease, which was executed on or about October 6, 1998. On December 1, 2017, the plaintiff became the successor in interest to the original landlord, pursuant to a warranty deed and an assignment and assumption agreement. As of December 4, 2001, the defendant became the successor in interest to the original tenant.

letter. After the defendant did not pay the base rent when due on April 19, 2020, the plaintiff served the defendant with a notice to quit for nonpayment of rent on May 4, 2020, directing the defendant to vacate the premises on or before May 12, 2020. The notice to quit included a disclaimer stating that "[a]ny payments tendered after the service of this notice to quit will be accepted as use and occupancy only and not as rent, with full reservation of rights to continue the eviction action."

On May 8, 2020, the defendant tendered $16,156.68 for the April and May base rent, which the plaintiff received on May 11, 2020, one day prior to the quit date on the notice. Shortly after this payment, Peter DiNardo, a representative of the plaintiff, and Chad Corrigan, a representative of the defendant, discussed the status of the lease. At trial, DiNardo testified that, during this conversation, he stated, "[Y]ou will not be reinstated on your lease. The lease is terminated." On May 12, 2020, DiNardo emailed Corrigan an offering memorandum for an adjacent property to demonstrate that the defendant's base rent was lower than the market rate. The offering memorandum included a lease summary that reflected a base rent for the adjacent property that was more than double the amount of the defendant's base rent. Over the next few months, DiNardo and Corrigan continued to have discussions regarding the defendant's tenancy at the premises, and DiNardo testified that, at some point, he offered to let the defendant stay at the premises under a new lease agreement with a higher base rent. DiNardo also explained that the plaintiff commenced this action seeking to recover possession of the premises in October, 2020, only when it became apparent that the defendant would not agree to a new lease.

During the months when discussions were taking place between DiNardo and Corrigan, as well as after

the underlying action was commenced, the plaintiff continued to send invoices to the defendant itemizing charges accruing under the lease, while also at times requesting use and occupancy payments. Specifically, on May 20, 2020, the plaintiff sent an invoice for "Rent (06/2020)" and "Water (05/2020)." On June 19, 2020, the plaintiff sent an invoice for "Use & Occupancy (07/2020)," "Legal (06/2020)," and "Late Fees (06/2020)." On July 13, 2020, the plaintiff sent a letter requesting that the defendant pay real estate taxes. On August 20, 2020, the plaintiff sent an invoice for "Use & Occupancy (09/2020)" and "Water (08/2020)." On September 18, 2020, the plaintiff sent an invoice for "Use & Occupancy (10/2020)" and "Late Fees (09/2020)." On October 21, 2020, the plaintiff sent an invoice for "Use & Occupancy (11/2020)." On November 20, 2020, the plaintiff sent an invoice for "Use & Occupancy (12/2020)" and "Water (11/2020)." On December 31, 2020, the plaintiff sent an invoice for "Rent (01/2021)" and "Real Estate Taxes (01/2021)." From January, 2021, to July, 2022, the plaintiff continued to send invoices for "Rent," late fees, water, and real estate taxes. The defendant made payments in response to each invoice and remains in possession of the premises.

A trial on the plaintiff's summary process complaint was held on September 21, 2023. Following the plaintiff's case-in-chief, the defendant's counsel made an oral motion to dismiss, arguing that the evidence showed that the plaintiff, through its actions, had equivocated the notice to quit it had served on the defendant, thereby depriving the court of subject matter jurisdiction. In particular, the defendant's counsel argued that any termination of the lease was equivocated by the plaintiff's offers to reinstate the lease and its requests for payment of items such as the water bill, real estate taxes, and

late fees, which arise solely under the lease. In response, the plaintiff's counsel argued that DiNardo explicitly stated that the lease was terminated and would not be reinstated; the discussions following the notice to quit did not evidence an intent to reinstate; and the payments following the notice to quit were accepted for use and occupancy only, per the disclaimer in the notice to quit.

After hearing from the parties, the court granted the motion to dismiss, finding that the plaintiff's conduct after service of the notice to quit had rendered the notice to quit equivocal. In its oral decision, the court explained that "[t]he fact that the complaint wasn't brought for another five, six months [after service of the notice to quit] while these communications were going on, while statements went out asking for rent, while the items that went for taxes, water, sewer, which are items on the rent, while late fees are still showing up on invoices, and a complaint got served five, six months later as a negotiation tactic probably, but I think by that point this lease was reinstated by the actions of the parties by the acceptance of the payment. . . . [B]ased on the testimony before the court, I can't find that this was not equivocated. The intent, the waiting the five months . . . during a global pandemic, the motion to dismiss is granted. The notice to quit was equivocated. The lease was reinstated as of the acceptance of that payment." This appeal followed.

On appeal, the plaintiff claims that the court improperly concluded that the plaintiff had reinstated the tenancy by accepting the defendant's tendered payments after service of the notice to quit despite the fact that the notice to quit included a use and occupancy disclaimer. It argues that the court's conclusion is "unsup-

ported by applicable law and [is] not supported by facts in the record."[3] We are not persuaded.[4]

We begin our analysis by setting forth the applicable standard of review and relevant legal principles regarding summary process. Whether the court properly concluded that the plaintiff reinstated the defendant's tenancy through its course of conduct following the service of an unequivocal notice to quit "presents a mixed question of law and fact to which we apply plenary review. . . . We must therefore decide whether the court's conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Centrix Management Co., LLC* v. *Valencia*, 132 Conn. App. 582, 586–87, 33 A.3d 802 (2011).

---

[3] The plaintiff also claims that the court "erroneously found that [the] notice to quit was equivocal and thereafter improperly granted the defendant's oral motion to dismiss because the plaintiff established its prima facie case" pursuant to Practice Book § 15-8. Although the plaintiff dedicates much of its brief to this point, we decline to address this claim because the basis for the judgment of dismissal, and the only issue before us in this appeal, is whether the notice to quit was made equivocal by the plaintiff's actions. Whether the plaintiff established its prima facie case is a separate issue that the trial court did not address in its ruling.

[4] We note that the defendant claims that this appeal is moot because the plaintiff failed "to challenge all of the factual findings and legal conclusions that led to the trial court granting [the defendant's] motion to dismiss on the basis of equivocation of the notice to quit." (Emphasis omitted.) The defendant argues that, because the plaintiff's brief focuses solely on events from May 4 to 12, 2020, including payment of the April and May rent and conversations between the parties' representatives, and does not address the other evidence on which the trial court relied, including the invoices that the plaintiff sent to the defendant, the plaintiff failed to challenge all the bases for the trial court's decision. This argument fails. Although an appellant must challenge all the independent bases for a trial court's adverse ruling to avoid rendering an appeal moot; see, e.g., *State* v. *Marsala*, 204 Conn. App. 571, 575, 254 A.3d 358, cert. denied, 336 Conn. 951, 251 A.3d 617 (2021); the late rent payments, the conversations between the parties' representatives, and the invoices are not independent bases for the court's judgment. Rather, they are simply separate pieces of evidence that support the only basis for the court's judgment—that is, that the plaintiff's conduct rendered the notice to quit equivocal. Consequently, this appeal is not moot.

When determining whether a landlord's conduct rendered a notice to quit equivocal, courts apply an objective standard that evaluates whether the words and actions of the landlord "could create reasonable doubt in the mind of a reasonable tenant as to whether the lease, in fact, remained terminated." Id., 589. In the present case, the facts are undisputed, and the court credited the testimony of DiNardo, the only witness who testified at trial. Accordingly, our review is limited to whether the court's legal conclusion that the actions of the plaintiff created reasonable doubt in the mind of the defendant as to the status of its tenancy was legally and logically correct and finds support in the undisputed facts that appear in the record. Id., 586–87.

"Summary process is a special statutory procedure designed to provide an expeditious remedy. . . . It enable[s] landlords to obtain possession of leased premises without suffering the delay, loss and expense to which, under the common-law actions, they might be subjected by tenants wrongfully holding over their terms. . . . Service of a valid notice to quit, which terminates the lease and creates a tenancy at sufferance . . . is a condition precedent to a summary process action under [General Statutes] § 47a-23 that implicates the trial court's subject matter jurisdiction over that action." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Waterbury Twin, LLC* v. *Renal Treatment Centers–Northeast, Inc.*, 292 Conn. 459, 466, 974 A.2d 626 (2009). Due to the expeditious nature of summary process, the relevant statutes "must be narrowly construed and strictly followed." (Internal quotation marks omitted.) Id. "The failure to comply with the statutory requirements deprives a court of jurisdiction to hear the summary process action." *Bridgeport* v. *Barbour-Daniel Electronics, Inc.*, 16 Conn. App. 574, 582, 548 A.2d 744, cert. denied, 209 Conn. 826, 552 A.2d 432 (1988).

In order to comply with § 47a-23, a notice to quit must be unequivocal. See *Getty Properties Corp.* v. *ATKR, LLC*, 315 Conn. 387, 407, 107 A.3d 931 (2015) ("[i]n order to effect a termination, the lessor must perform some unequivocal act which clearly demonstrates his intent to terminate the lease" (internal quotation marks omitted)); *Centrix Management Co., LLC* v. *Valencia*, supra, 132 Conn. App. 589–90 ("a paramount consideration is the goal of insulating the tenant from confusion and uncertainty"). Furthermore, despite the service of an unequivocal notice to quit, a landlord's subsequent conduct "can render the landlord's intent to terminate the tenancy equivocal, repudiate the intent to terminate set forth in the notice to quit, and reinstate the lease." *J. M.* v. *E. M.*, 216 Conn. App. 814, 820, 286 A.3d 929 (2022); see also *Centrix Management Co., LLC* v. *Valencia*, supra, 589–90 (concluding that unequivocal notice to quit was rendered equivocal by landlord's later written and spoken statements inconsistent with termination of tenant's lease). If the notice to quit is rendered equivocal by the landlord's actions and the lease is deemed to be reinstated, the court lacks subject matter jurisdiction over the summary process action. See generally *J. M.* v. *E. M.*, supra, 820 ("[a] notice to quit is a condition precedent to a summary process action and, if defective, deprives the court of subject matter jurisdiction").

The plaintiff's primary claim on appeal is that the court improperly concluded that its acceptance of payments from the defendant after service of the notice to quit rendered the notice to quit equivocal. It argues that, because the notice to quit included a use and occupancy disclaimer and, considering that DiNardo expressly told Corrigan that the lease was terminated and would not be reinstated, any payments the plaintiff accepted after service of the notice constituted use and occupancy and, therefore, did not equivocate the notice

to quit. In response, the defendant argues that the plaintiff mischaracterizes the court's reasoning. According to the defendant, the court relied not only on the plaintiff's acceptance of payments from the defendant, but also on the entirety of the plaintiff's conduct after it served the notice to quit, including its sending of invoices seeking the payment of sums due under the lease, its negotiations with the defendant on new lease terms, and its delay in instituting the underlying action.

We, therefore, begin with a review of the court's judgment. "The interpretation of a trial court's judgment presents a question of law over which our review is plenary. . . . As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole. . . . [W]e are mindful that an opinion must be read as a whole, without particular portions read in isolation, to discern the parameters of its holding. . . . Furthermore, [w]e read an ambiguous trial court record so as to support, rather than contradict, its judgment." (Internal quotation marks omitted.) *In re November H.*, 202 Conn. App. 106, 118, 243 A.3d 839 (2020). Although the court in the present case referenced the plaintiff's acceptance of the May payment as supporting its conclusion that the plaintiff's conduct equivocated the lease, it also referred to the plaintiff's other conduct, including the invoices sent by the plaintiff following the notice to quit and the delayed commencement of the summary process action. Consequently, we consider, as did the trial court, the entirety of the plaintiff's conduct after it served the notice to quit.

As previously noted, the plaintiff's primary argument on appeal is that, because it included a use and occupancy disclaimer in the notice to quit, the defendant

was on notice that all payments made after service of the notice to quit would be accepted for use and occupancy only, and not for rent. As support for its argument, the plaintiff relies on this court's decision in *O & P Realty* v. *Santana*, 17 Conn. App. 314, 551 A.2d 1287, cert. denied, 210 Conn. 812, 556 A.2d 610 (1989), in which we held that a landlord may accept rent and characterize it as use and occupancy if the landlord has notified the tenant that any payments made after service of the notice to quit would be accepted only as use and occupancy payments. Id., 318. The plaintiff's reliance on *O & P Realty* is misplaced considering the record before the trial court in the present case.

To be sure, use and occupancy disclaimers are both permitted and encouraged in a notice to quit, as they "[avoid] misleading tenants who tender late payments and . . . [insulate] the summary process action from being flawed by the acceptance of [payment] after commencement of the summary process." (Internal quotation marks omitted.) Id., 318–19. The inclusion of a use and occupancy disclaimer, however, does not preclude a determination that the tenancy was reinstated by way of subsequent conduct, especially when, as here, the conduct included sending regular invoices that specifically identified the amounts due as rent or other amounts due pursuant to the lease.

Indeed, in the present case, the plaintiff's inconsistent characterization of what the lease referred to as base rent, sometimes as "Rent" and sometimes as "Use & Occupancy," undermines the effectiveness of the use and occupancy disclaimer in avoiding confusion. Specifically, shortly after the notice to quit was served, the defendant tendered $16,156.68, representing the base rent due under the lease for April and May, 2020. Thereafter, on May 20, 2020, just a little more than one week after DiNardo and Corrigan spoke, the plaintiff sent the defendant an invoice for June, 2020, requesting the

payment of "Rent." Given that the defendant had just paid its outstanding balance to the plaintiff on May 8, 2020, the plaintiff's May 20 invoice for "Rent" certainly "could create reasonable doubt in the mind of a reasonable tenant as to whether the lease, in fact, remained terminated." *Centrix Management Co., LLC* v. *Valencia*, supra, 132 Conn. App. 589. Although the plaintiff subsequently charged the defendant for "Use & Occupancy" from June to November, 2020, that same charge again was referred to as "Rent" in the invoices from December, 2020, through August, 2022, which could further cause a reasonable tenant to question whether the lease, in fact, had been terminated.

Further, the plaintiff ignores the fact that, although its invoices between June and November, 2020, requested "Use & Occupancy" payments equivalent to the base rent due under the lease, it also requested payment of additional charges, including water, real estate taxes, late fees, and attorney's fees that were purportedly due under the terms of the lease. Those additional charges suggest that the lease remained in effect because "after a notice to quit possession has been served, a tenant's fixed tenancy is converted into a tenancy at sufferance. . . . A tenant at sufferance is released from his obligations under a lease. . . . His only obligations are to pay the reasonable rental value of the property which he occupied in the form of use and occupancy payments . . . and to fulfill all statutory obligations." (Citations omitted; footnote omitted.) *Sproviero* v. *J.M. Scott Associates, Inc.*, 108 Conn. App. 454, 462–63, 948 A.2d 379, cert. denied, 289 Conn. 906, 957 A.2d 873 (2008).

We recognize that "[u]se and occupancy payments encompass a fair rental value of the property, which necessarily accounts for obligations that are assumed by a landlord in renting the property, such as septic system maintenance. . . . Although, in many instances, use and occupancy payments are equal to

the parties' previously agreed upon rent, a landlord may be entitled to a larger use and occupancy payment when it is forced to assume obligations that were once the responsibility of a tenant under a lease." (Citation omitted.) Id., 465. Nevertheless, where the landlord identifies those charges, which have their foundation solely in the terms of the lease, separate from the use and occupancy payment it is seeking, it creates uncertainty as to the status of the lease and equivocates its notice to quit. This is particularly true in the present case, where the plaintiff invoiced the defendant separately for late fees and attorney's fees, which are only required pursuant to the lease and cannot be an element of use and occupancy due from a tenant at sufferance. See, e.g., *Milano* v. *Paladino*, Superior Court, judicial district of New Haven, Housing Sesson, Docket No. CVNH 9007-3897 (April 3, 1991) (3 Conn. L. Rptr. 444, 445) ("[t]he landlord cannot recover late charges as provided for in the lease for the months after the landlord terminated the lease through the service of a notice to quit"). In fact, at oral argument before this court, counsel for the plaintiff conceded that items such as real estate taxes and late fees do not fall into the category of use and occupancy.

The confusion created by the plaintiff's invoices was compounded by the fact that it waited months before instituting the underlying action while it continued negotiations with the defendant regarding its continued tenancy at the premises. We have observed that "providing a tenant with a new lease agreement or with an invitation to enter into a new rental agreement after a notice to quit has been served is inconsistent with an unequivocal notice to quit." *Centrix Management Co., LLC* v. *Valencia*, supra, 132 Conn. App. 587. In *Centrix Management Co., LLC*, the landlord served a notice to quit on the tenants after they failed to pay rent for four consecutive months. Id., 584. Following the notice to

quit, the landlord expressed his preference to *not* evict the tenants and instead sought to resolve the dispute. Id. Over the one and one-half months between service of the notice to quit and commencement of the summary process action, the landlord took steps to assist the tenants in staying on the premises, such as providing them with contact information for an eviction prevention program and agreeing in writing "to forgive two months [of] use and occupancy payments and [to] work with [them] to straighten out [the] arrearage." (Internal quotation marks omitted.) Id. Even after the summary process action was filed, the parties continued to discuss the tenants' ongoing occupancy of the premises. Id., 584–85.

One of the tenants moved to dismiss the summary process action on the ground that the plaintiff had not terminated the lease because the notice to quit was equivocal. Id., 584. Concluding that the notice to quit had been equivocated, the trial court dismissed the case. Id., 585–86. The landlord appealed, claiming that his subsequent communications constituted settlement negotiations that did not contradict the pending summary process action that was not being withdrawn. Id., 586. Affirming the judgment of the trial court, this court held that the subsequent actions by the landlord during settlement negotiations and the lack of communication to the tenants "that the summary process action was proceeding to conclusion unless they successfully negotiated a pretrial settlement" created reasonable doubt as to whether the lease was terminated. Id., 590.

The plaintiff argues that the facts in the present case are distinguishable from *Centrix Management Co., LLC*, and more akin to the facts in *Cheshire Land Trust, LLC* v. *Casey*, 156 Conn. App. 833, 115 A.3d 497 (2015). In that case, the landlord sent a letter to the tenants informing them that the lease was terminated and that the landlord was in the process of contracting with a

prospective new tenant for the premises. Id., 840. It included an ultimatum for the tenants either to vacate the premises or to negotiate separately with the new tenant by a specified deadline. Id., 840–41. Following the notice to quit, one of the tenants attempted to negotiate with the prospective new tenant but they could not come to agreeable terms. Id., 842–43. When informing the landlord's agent of this impasse, the agent told the tenant to either sign the proposed sublease with the prospective tenant within thirty-five minutes or the landlord would continue with the eviction action. Id., 843. Thereafter, the tenant, the prospective tenant, and the landlord's agent met. Id. During the meeting, the prospective tenant promised to accommodate the tenant in the proposed lease documents; however, no agreement was reached. Id. The trial court rendered a judgment of possession in favor of the landlord, concluding that the notice to quit was unequivocal. Id., 837–38. The tenants appealed, claiming that the notice to quit was equivocal, as the options presented in the notice to quit suggested that a new agreement could be negotiated and, in the alternative, that the landlord's subsequent actions equivocated the notice to quit. Id., 838. This court rejected the tenants' claim, holding that, "even if we assume that the [statements in the notice to quit] could be construed as inviting the [tenants] to enter into a new lease, that invitation would not have rendered the [landlord's] notice equivocal because it was accompanied by language clearly communicating that eviction would occur in the absence of an agreement to the contrary." Id., 841–42. Addressing the tenants' alternative argument, this court held that the trial court's conclusion that the subsequent comments by the landlord's agent constituted a clear and unequivocal warning that the eviction action would proceed in the absence of a new agreement with the new tenant was consistent with our holding in *Centrix Management*

*Co.*, *LLC.* Id., 843–44. We further observed that the approach in both *Centrix Management Co.*, *LLC*, and *Cheshire Land Trust*, *LLC*, "strikes the appropriate balance between allowing settlement discussions to continue and helping to ensure that the tenant is not unsure as to whether he or she still may be evicted pursuant to the pending action." (Internal quotation marks omitted.) Id., 842.

The plaintiff's reliance on *Cheshire Land Trust*, *LLC*, is misplaced. In its attempt to analogize the facts in the present case to those in *Cheshire Land Trust*, *LLC*, the plaintiff focuses on DiNardo's statement to Corrigan that the lease was terminated and would not be reinstated. When viewed in the context of all the subsequent actions by the plaintiff, however, this statement is not the same unequivocal ultimatum given in *Cheshire Land Trust*, *LLC*. The subsequent communications following the ultimatum in *Cheshire Land Trust*, *LLC*, were not inconsistent with the termination of the lease; rather, they reinforced the inevitability of an eviction action in the absence of an agreement. In the present case, in contrast, the plaintiff's actions following DiNardo's statement, namely, continuing to charge the defendant for obligations that arose only under the lease separately from the charges for "Use & Occupancy" and sending numerous invoices for "Rent" between May 20, 2020, and July 21, 2022, were inconsistent with a "clear intention to terminate the lease and to proceed with judicial process to secure possession." (Internal quotation marks omitted.) *Centrix Management Co.*, *LLC* v. *Valencia*, supra, 132 Conn. App. 589. As in *Centrix Management Co.*, *LLC*, the plaintiff's conduct, not only over the more than five months between the notice to quit and the commencement of the summary process action but also during the almost three years that the action was pending, created uncertainty as to whether

the landlord would proceed to conclusion with the eviction action. In other words, these communications would create reasonable doubt in the mind of a tenant as to whether the lease, in fact, remained terminated. See id. Accordingly, the court properly concluded that the notice to quit was rendered equivocal by the plaintiff's conduct.

The judgment is affirmed.

In this opinion, the other judges concurred.